WILLIAM RYAN, *et al., vs.* THE AMERICAN BARQUE WILLSCOTT, and WILLIAM SMITHER *vs.* THE AMERICAN BARQUE WILLSCOTT.

August 20, 1906.

*Shipping agreement—Condition precedent for proceedings for breach:*
A shipping agreement contains the following provision, to wit: "It is also agreed that if any member of the crew considers himself to be aggrieved by any breach of the agreement or otherwise, he shall represent the same to the master or officer in charge of the ship in a quiet and orderly manner, who shall thereupon take such steps as the case may require." *Held* that unless a seaman who is a party to such agreement makes a complaint as thus provided, for a supposed breach of such agreement, he may not thereafter set the machinery of a court of admiralty in motion to try a charge of such breach.

*In Admiralty:* Libels for shortage and bad quality of provisions.

*George A. Davis,* Proctor for Libelants.
*R. W. Breckons* and *J. J. Dunne,* Proctors for Libellee.

DOLE, J.  Two libels were filed in these proceedings, the first by William Ryan, Arthur Stander, Peter Petersen, John Lee, Henry Olsen and John Byrne, and the second by William Smither, all members of the crew of the libellee, both against the American barque Willscott.  The complaint was the same in both cases, with the same counsel, and was to the effect that from the 11th day of April to the 8th day of May the master of the libellee, while on the high seas, unlawfully reduced the allowance of provisions and food of the libelants by more than one-third of the quantity thereof, in violation of the contract between libelants and the ship, entered into at Newcastle prior to the beginning of the voyage from Newcastle to Honolulu; and also that for the whole of said voyage, to wit, from March 6th until the 8th of May, 1906, the said master, in violation of such contract, "did unlawfully furnish to said

seamen food that was bad, rotten, unhealthy and unfit for human consumption," and the said libelants claim under the statute the sum of $86.00 each.

A stipulation was made between the counsel, that the two cases be consolidated and tried on the depositions already made in the two cases, and upon such further evidence as either party may present.

A preliminary motion was made to dismiss the libels for that no prepayment of costs had been made by the libelants and no stipulation for costs, and that none of the libelants had shown themselves to be within the class of persons entitled under the act of Congress of July 20th, 1892, (27 Stat. L., chap. 209, p. 252,) to commence a suit or action in a United States Court as persons unable by reason of poverty to pay the costs of the action or to give security for such costs, or that this action is not commenced and prosecuted upon and for a contingent fee by an attorney able to pay costs and furnish security, and upon the further ground that it nowhere appears that the above named vessel is or will be about to proceed to sea before the end of the ten days next after the 10th day of May, 1906, the 11th day of May being the date of the filing of the first libel. No finding was made on this latter point.

Answers were filed denying the allegations of the libels relating to the provisions.

Both libels allege that the libellee is an American barque. The libel of William Smither alleges that libelant is unable to furnish any bond or stipulation for costs, and that there is no other person interested in such cause or the recovery therein who is able to pay or secure such fees and costs. The court found on this motion that these seamen suing for extra remuneration on account of shortage and bad quality of provisions, which by certain federal statutes may be sued for as wages, (sec. 4568 R. S. U. S.), were within the 43rd rule of this court, which provided that seamen suing for wages in their own right and for their own benefit, for services on board American vessels, shall not be required to give security for

costs in the first instance. The court, however, held that they must, in addition to the allegation that they are unable to secure costs, show that there is no other person interested in said cause entitled to share in the recovery who is able to pay or secure costs, and they were allowed one day to conform to such finding. Such allegations had already been made in the Smither libel. Counsel for libelants had filed a sworn statement waiving all claim to any remuneration out of such moneys as might be recovered in the suit filed by Ryan and others, except such as might be awarded him by the court, and that he believed that no other persons except the libelants are interested in the moneys that might be recovered in such suit, and that he was unable to make any deposit for costs or file any stipulations therefor. Five of the libelants in the Ryan case also joined in a stipulation with their counsel, that the compensation of their counsel shall be fixed by the court and that no other compensation shall be charged or exacted by such counsel. I think that this showing sufficiently covers the ground upon the point laid down by the preliminary findings.

The shipping contract under which these libelants engaged on the Willscott contains the following provision: "It is also agreed that if any member of the crew considers himself to be aggrieved by any breach of the agreement or otherwise, he shall represent the same to the master or officer in charge of the ship in a quiet and orderly manner, who shall thereupon take such steps as the case may require." The evidence in this case has been very full, both for the libelants and for the ship, and it does not appear that any complaint was made to the master in regard to the allegations of the libelants as to the shortage of provisions, and as to their poor quality, except that shortly after the beginning of the voyage, one of the libelants, John Lee, complained that the hash on a certain day was sour, and that the captain called all the men aft and told them that if anything was wrong with their food he wanted to see it himself, before it went forward, and would do his best to rectify all mistakes. About a month after this, about the 13th of

April, information was brought to the captain by the steward in regard to their excessive consumption of sugar, and after that some of the libelants, including libelant Ryan, demanded their statutory allowance not only of sugar but of everything else; and upon such request their statutory allowance was granted to all of the crew. There is no evidence that there was any complaint made in regard to the shortage or quality of any other article of food, or in regard to the food as a whole, except testimony by Ryan that on the occasion when the captain called the men aft about the food he asked them what the complaint was and "we told him the food was of bad quality for one thing," which complaint, if made, was too vague in character to convey any definite charge as to the quality of the provisions which the master might intelligently investigate. Stander also testified that he complained to the master about the quantity of sugar, and that after that they "got their sugar right along." There is no other evidence emphasizing the said complaint as to the hash, or tending to show that thereafter there was any complaint relating to it.

The provision of the shipping agreement referred to is obviously placed there in order that if anything goes wrong with the food any member of the crew may complain, and that thereupon the master may "take such steps as the case may require," and I consider it to be a requirement both upon the crew and on the master, so that if things are going wrong in regard to the food the crew or any member of it is required to complain, and upon such complaint the master is required to investigate and correct the evil if it exists, and it seems to me to be a fair construction of the contract that it was intended by this provision that the statute allowing extra wages to sailors for shortage or poor quality of food, may only be appealed to where this provision has been followed out by the crew or any member thereof, without relief; and I suggest as a reasonable rule of practice which this court is likely to follow in the future, that where no complaint has been made as called for by the provision referred to in the shipping agreement, a seaman may not set

the machinery of a court of admiralty in motion to try a charge of breach of such shipping agreement.

The evidence of libelants in regard to provisions as to quality, referred mainly to the beans, rice, oatmeal, potatoes, coffee, molasses, dried apples, mustard and pickles, and they produced samples of mustard and pickles taken by them according to their testimony from the ship's stores. Their evidence was emphatic that the molasses, oatmeal, rice, beans and dried apples were full of maggots, weevils and dirt, and were utterly unfit for food, and that the potatoes, coffee, mustard and pickles were bad and unfit for use. The testimony of these witnesses was not always harmonious, the witness Ryan testifying that the beans were all right, and they disagreed materially in regard to the allowance of pork.

The defense put on ten witnesses, including the master, the first mate and the cook, all of these men being on the vessel on the voyage up and a part of its crew and officers, and testifying that they were remaining on the vessel for a new voyage. The testimony of these men agreed as to the good quality of the food for the voyage, rebutting the testimony of the libelants definitely and positively, not only showing that the food was satisfactory in quantity and quality, but that the food for the cabin, so far as the staple articles of food were concerned, referred to in the agreement, was the same as that furnished to the forecastle, cooked in the same kettles and only separated and divided after cooking, part being sent to the forecastle and part to the cabin. After the libelants demanded their allowance, their "whack" in sailor parlance, by which is meant their statutory allowance to be weighed out to them, their allowance of flour was weighed out to them along with the other classes of food, and their allowance of water measured out to them in full, out of which they were required to furnish water to the cook for the making up of such flour into bread as they might furnish out of their allowance of flour. It appears by the testimony of some of the libelants that for some unknown reason they failed to furnish sufficient water and flour to the cook for

the bread they needed, and so went without bread a part of the time. In this way they accumulated between three and four bags of flour by the time they reached Honolulu. This by their own testimony they peddled out, with about ten pounds of sugar which they had also saved, after their arrival here. The captain testified that one of these men offered to sell him this flour. It is apparent that libelants had sufficient flour and water for the bread they needed. And their failure to get their supply resulted through their own neglect to furnish these articles to the cook. There is evidence that the rest of the crew who were on the same allowance had no difficulty in obtaining bread; but then they were not saving up flour to sell at the end of the voyage. I feel that the evidence of the libelants, which is not intrinsically strong, has been fully met and rebutted by the evidence for the libellee. It is significant that several of the libelants upon being paid off before the shipping commissioner, for the voyage in question, complained about the bread and flour and water as to quantity, but made no complaint or allusion to any other class of provisions used on the voyage. One of them, Lee, spoke of the flour they had saved up, and said they offered to sell it to the captain.

It is not clear to me where the samples produced by libelants came from. The tin of mustard was shown by the libellee's witnesses to have been a different kind of container from anything they had on board the ship, and that the liquor of the pickles was entirely different from the liquor of the pickles used on the ship, and certain statements referring to certain admissions as to the bad quality of the food, charged to have been made by the first mate in the presence of the cabin boy, were positively rebutted and denied by them.

The libellee placed two witnesses on the stand, persons entirely disconnected with the ship, one being an experienced grocer of Honolulu, H. McIntyre, and the other a purchaser of sea provisions for Alexander & Baldwin, J. Fleming. These two individuals had been on board the ship after its arrival in Honolulu, and examined the stores before any addi-

tions had been made to them, and reported them as good in every particular, and satisfactory according to stores usually furnished for sea-going ships. They produced samples taken by them from the stores, of rolled oats, rice, dried apples, coffee, molasses, beans and mustard, which were introduced as exhibits. Their testimony recognized some difference in some of the stores furnished by dealers to ships and those furnished to the family trade in favor of the latter, but they agreed that the ship's stores examined by them were all good.

Therefore, on the ground that no complaints were made of the quality of these provisions during the voyage, as provided by the shipping agreement, (with the exception of the immaterial complaint made as to the hash and Stander's complaint as to shortage in sugar, which he admits was corrected), and on the ground that the evidence has failed to prove the allegations of the libel in regard to the food, I am compelled to find for the libellee and dismiss the libels with costs to libellee.

In connection with my examination of Exhibit 1, (sample of pickles), the liquor was lost, and as the sample cannot remain unchanged without such liquor, the clerk is authorized to throw away this exhibit.